or Abhi. I would say Abhi. You can tell me which one it is. And when counsel for appellant, when you're ready, you can make your appearance and proceed. Thank you. My name is Violet Edelman, and I am representing J. Conn Abe. I would like to reserve two minutes of my time for rebuttal. The government secured Mr. Abe's conviction in this case by introducing an avalanche of inadmissible evidence, leading the jury to a foregone conclusion of Mr. Abe's guilt. To start, all three of the out-of-court identifications were subject to highly suggestive and insurmountable risk of misidentification. The photo arrays themselves were so suggestive that they really left the witnesses with no alternative but to identify Mr. Abe when they made their identifications. Mr. Abe's photo was first every time. The officer who was investigating the case presented the arrays. There were only five photos, and they were And perhaps the most problematic issue, really, is that Mr. Abe was the only person in the array with the trademark curly hairstyle that the witnesses described ahead of time. I looked at that array, and I thought it was a pretty tough array. And therefore, I'm led to ask the question, what sort of legal standard, what is the legal standard that governs whether we should view this as being suggestive? I mean, what does precedent tell us about when we should deem this to be problematic? I mean, number one, what about being first is problematic? And number two, surely this is not just, you know, sort of an obscenity test, you know it when you see it kind of thing. Because when I look at the array, I thought it was pretty tough. I mean, unless I knew who I was looking for, I wouldn't be able to find them. So maybe I'm just wrong on that. So how do we, what is the legal test for when we determine whether the array itself, visually, is problematic? Well, it is a fact-specific inquiry, and this court reviews it for clear error in terms of the suggestions. Well, then that's tough. It is tough. But in this case, the specifics of the descriptions that were given of the curly hair was one of the only things that the witnesses could decide. And so when the officer went to make the array, that was something that he should have had in his mind. And because that's the thing, Mr. Abe's photo is the only one that has someone where you can see that he has curly hair. Number two and number three seem pretty curly to me. I don't, I don't, I see that, I don't, I don't know. I'll leave it alone. Go ahead. Well, I will say that it's possible, I think there's an argument that number two might have curly hair, but he also has a scar on his eyebrow. And all of the witnesses said that the person that they saw didn't have any identifying marks or specifically scars. So it would be easy to rule him out if, if there was a question there. I think what the Supreme Court has said and what this court has said about when this procedure is suggestive, it really is when the resulting identification is inevitable or when there's something about the facts of the array suggests to the person that they are expected to make an identification. And so in addition to the way that the array looked and in relation to the descriptions that were given, the officer also did make the witnesses feel like they had to make an identification. And that was the most problematic instance of that was with Garrett Rice, where the officer approached him and said, do your best to pick him out. And this court has... If you can. If you can, yes. But that's a pretty unambiguous communication that he expected an identification. But then he complimented that with the standard explanation that he may or may not be the suspect, may or may not have been apprehended, he may or may not be in this array, et cetera, right? Yes. Yes, he did do that. But once there are comments that communicate that kind of directive, I think it's very hard to undo the harm done in terms of suggestiveness. And he also discussed with Garrett Rice the traumatic nature of what happened and suggested that Garrett Rice could have died that day, which I think played up the kind of stakes for Mr. Rice. And it also implicitly encouraged an identification. And the judge acknowledged that and found it suggestive. Yes. Yes, the judge found Garrett Rice's procedure suggestive. And the error there was that it didn't give sufficient credit to the problems inherent in the array itself, as well as the lack of reliability in Garrett Rice's identification. Because the question really becomes once the to overcome the risk of misidentification. Can I ask you maybe an argumentative question? It may be argumentative, it may be just hard, but it's troubling to me. The government argues that any error would have been harmless beyond a reasonable doubt. Gordon Rice is looking at this guy. He's not in fear. Nobody has a gun against him. The guy has a razor blade, but he's talking to some guy that's really mad. And what he's really mad about is he's thinking he's surveilling him across on the other side of his repair shop. And so this is the middle of the day. He's just a few feet away. And in terms of reliability, it seems like it would be a stretch to say that it was an abuse of discretion, but that's maybe the argumentative part of the question. But if Gordon Rice eyeballs this guy, there's no question that the guy that confronted Gordon Rice comes back, leaves, comes back, hits him, gets the gun, goes across the street, robs the insurance company. Put Amaya's identification aside, put Peter Cordova's identification aside. What he's yelling about is that he is surveilling him, and the undisputed testimony even in the appeal briefs is that this guy lives right across from the repair shop. And Cordova's photo identification, their in-court identification, isn't all of theirs basically harmless beyond a reasonable doubt. No, because the issue in the case, which I think is part of what your question is based on, was identity. But the question is whether the jury, without all of this evidence that was inadmissible, would have come to the same conclusion of function to answer that question for them on some level. So without those inadmissible identifications, it's impossible to say that the jury would have felt as certain that this was the same person. I think also specifically, even though Garrett Rice saw the assailant for a few minutes possibly before the altercation really escalated, he himself said after the fact, when the officer was interviewing him, that he didn't remember what the person looked like. And he repeatedly discussed the state of shock that he was in, and he was in the videos that we've submitted, he was in a very agitated state. So a lot of the factors that this court looks at in terms of determining reliability really do weigh against that finding. He also, you know, the description that he gave was incredibly vague and included almost no details. Well, he said he was six and a half feet tall, and he's six foot one. That's not way off. Well, I think there's a big difference there. I mean, it's pretty common for people to say six foot and a half. I don't think he said six inches. I thought he said like six, like a little short of six foot one. He said I think he was six feet or six and a half feet or something like maybe six five or something like that. He said six foot five? I believe so. At one point. And other than that, I would say height was maybe the only thing that Garrett Rice could specifically describe. He couldn't give any description of facial characteristics or really much of anything else. I think the only thing he said repeatedly was in mentioning the assailant's race. So it is really hard to overcome the acknowledged suggestiveness of his procedure with reliability, because there really are very there are almost no indicia in his case. And same with the other two. I mean, Rocio Amaya testified to not remembering, didn't remember what he was wearing, didn't feel like she was the person who really got a good look at him, was focused on the gun throughout most of the encounter. So in contrast to cases where reliability has been sufficient to overcome suggestive procedures, the reliability here is really lacking. And so this is the kind of case that this court should should be worried about in terms of the risk of misidentification and the inability to overcome that risk. Let me ask you a question about the scope of your argument on this, on the other acts evidence, the intrinsic slash 404B evidence. In the district court, it appeared to me that defense counsel focused on saying that they wanted to exclude the assault, the actual attempting to fire the firearm. As I read your appellate brief, you're trying to exclude more stuff. In other words, you want this just to be the segment of surveillance of the footage showing the individual picking up and later walking away with the gun. That's different, is it not, than the idea of just excluding the assault? Yes. So in a written filing in response to the government's intent to introduce that defense counsel made a broad argument asking to exclude most of what would come from Garrett Rice and also the most of the video. And then when it became clear that the court was planning to admit some of it, she did narrow her argument and focus on the pointing of the gun and the attempted firing. Well, that ends up being an abandonment, does it not, under our precedent on preservation? I mean, if she starts out making an initial argument, she gets the win that the court is not going to buy that. And unless she preserves it and goes for a subset of that, why didn't she abandon the broader argument? Well, she did preserve the broader argument at the outset. But even if this court finds that it is confined to the specific objection that she later made, that is reversible in itself. Just the evidence that the person pointed the firearm and attempted to shoot it at Mr. Rice, that's extremely problematic. It has nothing to do with any of the elements of the crimes charged. What about identity? Well, if we're talking about a universe where most of it comes in except for the attempted firing and pointing, I don't really see how that is particularly probative of identity. Well, let me test that. I mean, your argument is that he was understandably, you presented very well, that Mr. Rice only was exposed to him for a very limited period of time. Well, he has the initial interlude before there's any, you know, before Mr. Rice comes back with the gun. And then both sides have arguments about, well, what does it mean if I'm looking at somebody that's pointing a gun at me? Well, the government argues that I am sure going to be fixated, my concentration is not going to be, I'm not going to be thinking about what I have, what I'm going to have for dinner. I'm going to be thinking about the guy that's pointing a gun at me. And of course, you're very capably and very persuasively arguing, well, just the opposite. You're going to be consumed with fear. But in any event, that's all ammunition for the fact finder. And so isn't it probative at least under Rule 401 and 402 to identification? The moment where Garrett Rice was faced with the gun is likely the least probative, especially under the theory that, you know, when someone is faced with a gun, that that's what they're going to focus on, not on the person who's pointing it. But even if it has some limited probative value, it really falls apart at 404B that looks at prejudice, because it's so prejudicial. I mean, it just, it's almost hard to even describe what it would do to a jury to hear about something like that, which could almost be an attempted murder in the context of this Hobbs Act robbery trial. But we, on 403, we do have to, under United States v. Herrera, United States v. Tee, on review, don't we have to attribute to that evidence its maximum probative value and its minimum reasonable danger of unfair prejudice? Yes, I mean, but on the other hand, I think probative value is looked at in relation to the other evidence that's available. And if it's so overwhelmed by prejudice, then it does fail at 403. And so here, the prejudicial effect was just immeasurable. I see my time is running out. Sorry. If there are no further questions, I'll conclude. Thank you. Thank you. I apologize for that. Oh, no, it's okay. May it please the Court. Please. Sean Sullivan for the United States. Good morning, Your Honors. I'd like to begin with, to continue a little bit with the discussion we were just having about the pointing of the firearm and the attempted firing of the firearm at Garrett The first thing I'll say about that is we're here to decide whether Judge Johnson, the district court, abused his discretion. So it's exactly right to consider the narrow issue, not what was in the original defense briefs, but as it was narrowed and presented to Judge Johnson at the time he made his decision, which was the defense said, we're only here to seek to exclude the attempted firing of the gun. In terms of that proving identity and proving preparation and plan, as the district court found, I just want to add one little bit more of information. We know in this case that the only video evidence, in a case where the identity of the perpetrator was highly contested, the only video evidence comes from the auto shop. So what we have is a few pieces of evidence that have to trace us back to the auto shop. And there's two particular pieces of evidence that are mentioned in my brief and were highlighted at trial. One is the razor blade that was found outside the insurance business on the ground and the bullet and how a matching bullet was found outside the auto shop as well as the razor blade. So I want to direct your attention back to the video from the auto shop and particularly the point in the video where the perpetrator in the government's position, Jaquan Abe, is trying to shoot the gun and he's re-racking and reloading the gun. On the video that's labeled South Side Front Lot, at zero minutes fifty seconds, you see a bullet fall to the ground. And then at one minute four seconds, you see the perpetrator, Jaquan Abe, pick up the bullet from the ground. And as he's doing that, a razor blade falls out of the park. It falls to the ground. So in terms of the intrinsic nature of this particular piece of evidence, the bit of the video about the attempted firing of the gun, those two critical pieces of video are important because the razor blade and the bullet have to connect to the ones that were found at the insurance business. So that wasn't in the briefing, but that's just a supplement to our argument and makes it even more well-founded on Judge Johnson's part that he found this evidence goes to identity and was properly admitted. I'll shift gears now and talk about the eyewitness identifications. And I know Judge Holmes, at the beginning, you asked the question, what legal standard governs suggestiveness for a visual array? And I'd submit to you that the standard is that the police identification procedure should ordinarily go to the jury unless, and I'm quoting from Perry, page 232, there's a very substantial likelihood of irreparable misidentification. So ordinarily, it's a jury question. I'd say that in the Perry opinion, more colloquially, Judge Ginsburg says, the question is, did the police try to rig the lineup procedure? And we were talking before about the page that had the photos on it. Not the manner of presentation, but the photos themselves. I submit to you that the police weren't trying to rig that lineup card. That was a fair lineup card. And that's the point. I mean, yes, if the overarching issue is, were the police trying to rig the identification, underlying that is the subsidiary issue of how you evaluate the photo array. And I guess what I'm trying to get at is, what judgment do I make or how do I go about determining whether these are similar photos or not? And how would I be positioned to say the district court was wrong in saying that there was significant difference between them? I mean, this can't be just my one eye look at it, because I mean, they look pretty similar to me, but that surely can't be the test. The test from the case law is, you have to look at the lineup and see if you can identify an oddball photo. I think that's a quote that's been used before. If there's one that just stands out from the others, that's patently different. Other than that, the language from the case law is, is there one that leads an unguided eye to a particular person? And here we don't really have that. Bill, can I ask you about that? The one attribute of the several descriptions that didn't resonate with me from defense counsel was him leaning in. I mean, if you, I mean, it's pretty, that is an oddball attribute, because it's sort of like a photo lineup of the three of us, and it's got me right here and my colleagues lean back. I mean, that's kind of what exactly that photo array was. Your Honor, it is different, but it isn't a difference that's pertinent to the descriptions the witnesses provided in this case. So, for example, if somebody had a scar, was wearing an earring, something like that, that a witness had mentioned during the course of the crime, then it would be pertinent. Also, I direct your attention to the standard instruction that all of these witnesses received, and it's on the videotape of each identification procedure, which is there's going to be some variation in different things when you look at this, and don't make a, don't assume based on slight differences in the photos, lighter, darker, more recent, less recent, things like that. So, that should counteract between it and that should cure any problem with that in terms of suggestiveness. On identification, I submit to you that the law is that usually it's a jury question to decide whether an identification is reliable, and it's only in those limited circumstances where a district court should take that decision out of the hands of the jury and make the very substantial likelihood of irreparable misidentification. We don't have that in this case, and here the jury was well equipped and Judge Johnson made the right decisions. One, they got a jury instruction on how to weigh eyewitness identification. It says right in there, don't assume that the person on trial is the offender. You need to, among other things, in finding whether the government has proved its case beyond a reasonable doubt, one of those issues is the identity of the person, and then it goes into all the standard of instructions that the Tenth Circuit has created, that that committee and this court have created about how to weigh eyewitness identification. So, the jury had the proper legal roadmap, and then they also had something that you don't get in every case, which is they had video and audio recordings of the full identification procedures. So, it wasn't just a matter of asking the detective, well, how long did it take for him to identify? How were your questions worded? Did you say them clearly? How did the witness look? The jury could see all of that for themselves. So, I submit to you this is really a textbook case of the kind of thing where the issue should go to the jury. The jury had the video of the identification procedures, they had the legal instructions, and they had rigorous cross-examination from the defense. Identity was the key issue in this case. The defense really put all its eggs in that basket. So, I see I have about six and a half minutes left. Unless there's more questions from the panel, I'll just conclude with this. Let me ask you, Mr. Abe, I believe in his brief, points to Eighth and Ninth Circuit cases that purport to hold that due to the danger of unfair prejudice, probation officers should never provide lay opinion identifications unless there is no other adequate identification testimony. Well, I mean, there was adequate identification testimony here beyond the probation officer. So, why should we adopt that rule, and why was the probation officer's testimony here necessary? Your Honor, the district court did not abuse its discretion in allowing the probation officer to testify. I believe your controlling legal authority would be contrarious. That comes from the Tenth Circuit, and it talks about how there only needs to be some basis for concluding the witness is more likely to correctly identify the defendant than the jury. Here, the district court did the right thing. It applied Federal Rule of Evidence 701 that concerns lay witness opinion testimony, and it recognized that, as Contreras has said, human features develop in the mind's eye over time, and somebody who is able to see somebody on a prior occasion, a non-stressful occasion, which makes them different from the eyewitnesses in this case, several different times is better than the jury in weighing identification. Remind me, was Contreras a probation officer case? It was some type of law enforcement or judicial official. I don't remember exactly who it was. I think it was a probation officer, but he knew Jaquan Abe differently from the jury. As he testified, well, first, before Judge Johnson agreed to admit the evidence, he had a hearing outside the jury's presence, and Mr. Silva testified, and he explained how he knew Jaquan Abe, the time frame, the nature of their prior interactions, how long they lasted, and he provided a lot of details that would establish his reliability. For example, he knew that Abe lived with his grandmother. He was one of the youngest and few African Americans on his docket as a probation officer. He had a brother in the criminal justice system. He said he remembered the way he walked, some distinguishing physical features. That's a lot he would bring to the table as opposed to a juror who would just see Jaquan Abe masked for most of the trial in the courtroom and watch a video of someone who the government was insisting was him and the defense was insisting was not. So it definitely aided the jury to have that kind of testimony. Judge Johnson, very reasonably and correctly, in a proper exercise of its discretion, he agreed with the government's proposal to sanitize that testimony, not mention that the witness was a probation officer or that anything that would suggest that Jaquan Abe had prior contacts with the judicial system before the dates of these alleged offenses. So to answer that question, the controlling authority should be the Tenth Circuit law in the case, and particularly Contreras. Contreras leads us right to the conclusion that Mr. Silva, the probation officer, should be allowed to testify because he offered testimony of a different character than these fact witnesses, these eyewitnesses who saw him one time under stressful conditions, and nobody told him at the time, you better take note of certain things. You might have to identify him later in a court of law, as opposed to somebody who saw him in a office setting several times, calm, totally different context. He knew the person. The law really says here in the Tenth Circuit, sometimes it's family members. When you have an identification case, and it's hotly contested people who were strangers and saw the witness on one occasion, the government is allowed to bring in, so to speak, a ringer, somebody who actually knows the person. And that's what we did in this case. We asked Judge Johnson to do it, and he properly exercised discretion by allowing Silva to testify. I'd probably use another word than ringer, but that's okay. I understand the point. Sure. I have a question about Ms. Amaya's in-court identification. Now, you argue that, well, there's no harm, no foul. She didn't identify him. But I wonder if it really cuts the other way. Let's say you have a medical malpractice case, and a medical expert has to testify to a diagnosis, for example, to a reasonable degree of medical certainty. And the plaintiff calls in my spare time. I'm a neurosurgeon and Dr. Bacharach. And I, on the witness stand, say, have I asked, well, did the defendant, did the plaintiff have cancer caused by the malpractice? Can you say that, Dr. Bacharach, to a medical degree of certainty? Heck no. But I'd say the chances are pretty overwhelming, certainly better than 50-50 that it is. And that's ultimately deemed on appeal to be inadmissible because it didn't meet the degree of medical certitude. But isn't that pretty darn prejudicial? And isn't that the same thing with Ms. Amaya saying, well, it probably was that fellow at the witness table that's wearing the mask. But can I say 100% or to a certainty? No. Well, maybe there should have been a foundational hearing to see if she could identify him in court without the jury present before the jury is exposed to this inadmissible sort of identification testimony. Why isn't that problematic rather than helpful to you? Sure. I think that it might be distinguishable from the physician example that you're giving. I don't know if in that case, if it's a hypothetical case, if that's the only evidence on the point that you're trying to prove, the medical diagnosis. Here, what the jury instruction said was that the jury had to decide whether the perpetrator committed the crimes beyond a reasonable doubt. It was emphasized for them that identity was an issue. So really, I think here it's not unfairly prejudicial because if you look at the whole context, there are various pieces of the identification. There's the video and there's the jury's opportunity to see the person in the courtroom and compare them to the video. There's various descriptions provided by various eyewitnesses as well as a lot of the other facts that we were discussing related to harmless error, which is he lived behind the auto shop, he went to Highland High School and it was a Highland High School sweatshirt. So I don't think there would be a need for a pretrial hearing on the issue. It was something that really was just consideration for the jury and they could weigh it properly. If they had doubts about Rocio Amaya because she couldn't identify 100%, they could take that into consideration. The defense could certainly exploit it on cross-examination and in closing argument. On the other hand, she made a prior identification on another day closer in time and these other witnesses also identified the same person. So I would submit that it would not be grounds for reversal. Thank you, counsel. Ms. Edelman, if you want it, you can have a minute of rebuttal. I would just like to make two quick points. The characterization that the government kind of focuses on that the photo needs to be an oddball actually comes from this court's decision in the United States to be Sanchez. And the context of that expression of the standard was that when there are only six photographs, the slight irregularities are likely to be more pronounced and produce an oddball photo. And that is what happened here, particularly in light of what Judge Bacharach pointed out about the leaning in and the close-cropped depiction of Mr. Abe. I would also say that to the government's point that this is a question for the jury in terms of the identifications, the Supreme Court has been clear that there is a reason we have due process protections when there are suggestive procedures and that that evidence needs to be suppressed and not given to the jury. Because by the time that someone has been presented with a suggestive array and made an unreliable identification, there is no going back and rectifying that. So when they make an in-court identification, even if it's a tentative one, it's already been informed by this jury can't really make a good determination about credibility. Thank you for these reasons. Mr. Abe asks that his conviction be reversed. Thank you, counsel. Case is submitted.